1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Frank S. Hedin (SBN 291289)
HEDIN LLP
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone:   (305) 357-2107
fhedin@hedinllp.com

*Attorney for Plaintiff and Putative Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDER SISTI, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br>　　v.<br><br>BOSLEY INC.; and BOSLEY MEDICAL GROUP, a medical corporation;<br><br>　　　　　Defendants. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Alexander Sisti, individually and on behalf of all others similarly situated, by and through undersigned counsel, hereby alleges the following against Bosley, Inc. ("Defendant Bosley") and Bosley Medical Group ("Defendant BMG") (together, the "Defendants").  Facts pertaining to Plaintiff and his experiences are alleged based upon personal knowledge, and all other facts herein are alleged based on due investigation of counsel and upon information and good faith belief.

**NATURE OF THE CASE**

1.    Plaintiff brings this action to redress Defendants' practices of knowingly disclosing Plaintiff's and the putative class members' personally identifiable information ("PII") and protected health information ("PHI") (collectively, "Private Information") in violation of state and federal law.

2.    Defendants are related hair restoration companies performing surgical hair transplantations with 70 locations across the United States.[1]

3.    Defendant Bosley is a Delaware corporation which holds certain trademarks and intellectual properties relating to the Bosley hair transplantation brand.  Defendant Bosley also conducts advertising and initial patient intake on behalf of Defendant BMG.

4.    Defendant BMG is a California professional medical corporation which employs physicians and other medical professionals who treat hair loss in patients through surgical hair transplantation.  Defendant BMG is a "covered entity" under the Health Insurance Portability and Accountability Act ("HIPAA").

5.    Defendant Bosley owns and operates the website www.bosley.com (the "Website"), which markets the medical services of Defendant BMG.  The Website hosts an online scheduler which allows prospective patients to set up consultations with physicians employed by Defendant BMG.[2]

---

[1] See Bosley, "Bosley Hair Restoration Locations Near Me," available at https://www.bosley.com/locations/#:~:text=With%20seventy%20locations%20across %20the,matter%20where%20you%20call%20home. (last accessed Jul. 22, 2025).
[2] *See* Bosley, "Schedule Your Free Hair Loss Consultation," available at https://www.bosley.com/scheduler/ (last accessed Jul. 22, 2025).

CLASS ACTION COMPLAINT

6.      As a business associate of Defendant BMG, Defendant Bosley is also a "covered entity" under HIPAA.

7.      Patients, including Plaintiff and each of the putative class members, who schedule an appointment through the Website have a reasonable expectation that the Private Information they enter on the Website will be kept confidential.

8.      However, unknown to their patients, Defendants have installed online tracking pixels on the Website which disclose and transmit the patients' Private Information to third parties, including, but not necessarily limited to, Meta Platforms, Inc. ("Meta") and TikTok, Inc. ("TikTok").

9.      By installing the tracking pixels, Defendants knowingly and intentionally disclosed to Meta and TikTok their patients' health data and other highly sensitive information, including their PII, PHI, the fact that the users sought consultations with hair transplantation clinics, and the locations of the clinics where they sought those consultations.

10.     Information concerning a person's health is among the most confidential and sensitive information in our society and the mishandling of such information can have serious consequences, including public embarrassment, discrimination, and the denial of insurance coverage.[3]

---

[3] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world* (Nov. 16, 2022), available at   https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ (last visited Nov. 20, 2024) ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized.");

CLASS ACTION COMPLAINT

11.    State and federal laws clearly prohibit what Defendants have done. Accordingly, on behalf of himself and the putative class members defined below, Plaintiff brings this Class Action Complaint against Defendants for intentionally and unlawfully disclosing his Private Information.

## PARTIES

### I.    Plaintiff Alexander Sisti

12.    Plaintiff Alexander Sisti is, and at all times relevant hereto was, a citizen and resident of Laurel, Maryland in Prince George's County.

13.    Plaintiff has used and continues to use the same device to maintain and access an active Facebook account throughout the relevant period in this case.

14.    Plaintiff has scheduled a consultation through the scheduler on Defendants' Website.   Specifically, on November 3, 2024, Plaintiff scheduled a consultation for November 25, 2024.  Plaintiff provided his name, email address, and home address in association making this appointment.

15.    At all times relevant hereto, including when scheduling a consultation on the Website, Plaintiff had a Meta account, a Meta profile, and a Facebook ID ("FID") associated with such profile.

16.    Plaintiff provided Meta his name, birthday, email address, and phone number in association with the creation of his Facebook account.

---

*see also* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites* (June 16, 2022), available at https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited Nov. 20, 2024).

17. When Plaintiff scheduled a hair transplantation consultation on the Website, Defendants disclosed to Meta Plaintiff's FID, his other personally identifying details, the fact that he had scheduled a consultation with a hair transplantation clinic, and other information about Plaintiff and the device he used to schedule the consultation.

18. Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendants to disclose his Private Information to Meta.

19. At all times relevant hereto, including when scheduling a consultation on the Website, Plaintiff had a TikTok account and a TikTok profile.

20. Plaintiff provided TikTok his name, birthday, email address, and phone number in association with the creation of his TikTok account.

21. When Plaintiff scheduled a hair transplantation consultation on the Website, Defendants disclosed to TikTok unique identifiers permitting TikTok to personally identify him, the fact that he had scheduled a consultation with a hair transplantation clinic, and other information about Plaintiff and the device he used to schedule the consultation.

22. Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendants to disclose his Private Information to TikTok.

23. Because Defendants disclosed Plaintiff's Private Information during the applicable statutory period, Defendants violated Plaintiff's rights and invaded his statutorily conferred interest in keeping such information (which bears on his personal affairs and concerns) private.

4

## II.    Defendant Bosley, Inc.

24.    Defendant Bosley, Inc. is a Delaware corporation that maintains its headquarters and principal place of business at 9100 Wilshire Boulevard, East Tower Penthouse, Beverly Hills, CA 90212.  Defendant Bosley, Inc. operates and maintains the Website www.bosley.com, where it accepts prospective patients' Private Information and conducts patient intakes on behalf of Defendant Bosley Medical Group.

## III.    Defendant Bosley Medical Group

25.    Defendant Bosley Medical Group is a California professional medical corporation that maintains its headquarters and principal place of business at 500 Brook Road Suite #100, Conshohocken, PA 19428.  Defendant Bosley Medical Group performs hair transplantation surgeries at 70 locations across the United States. Defendant Bosley Medical Group contracts with Defendant Bosley, Inc. to provide marketing and patient intake services.

## JURISDICTION AND VENUE

26.    The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331.

27.    The Court further has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C § 1332(d) because the amount in controversy in the aggregate exceeds $5,000,000, exclusive of interest and costs, as to each putative class, because there are more than 100 putative members of each of the putative classes, and

5

1   because many members of each of the putative classes are citizens of a state different

2   from Defendants.

3           28.     Personal jurisdiction is proper in this judicial district because

    Defendant Bosley, Inc. maintains its headquarters and principal place of business in

4   California and Defendant Bosley Medical Group is incorporated in California.

5           29.     Venue is proper in this District under 28 U.S.C. § 1391(a) through (d)

6   because a substantial part of the events giving rise to this action occurred in this

7   District, including Meta's receipt (at its corporate headquarters in Menlo Park,

8   California, which is within this judicial District) of the Private Information of

9   Plaintiff and putative class members that was unlawfully disclosed to it by

10  Defendants, as alleged herein, and the resulting harm to Plaintiff and putative class

11  members. Additionally, many of the witnesses and much of the electronic discovery

12  relevant to Plaintiff's and putative class members' claims are located in this judicial

13  District, including at the headquarters of Meta.

                            **DIVISIONAL ASSIGNMENT**

14          30.     Pursuant to Civil L.R. 3-2(c), 3-5(b), and General Order No. 44, this

15  Action is subject to assignment on a district-wide basis.

                             **FACTUAL BACKGROUND**

16  **I.      Healthcare Information Policy**

17          31.     Defendants owed common law, statutory and regulatory duties to keep

18  Plaintiff and the putative class members' communications and private medical

19  information safe, secure and confidential.

20

---

6

32.    First, Defendants' disclosure of Plaintiff's and the putative class members' Private Information via the tracking pixels contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.

33.    While healthcare organizations regulated under HIPAA may use third-party tracking tools, such as Google Analytics or Meta Pixel, they can do so only in very limited ways:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[4]

34.    Further, Defendants owe statutory and common law obligations to Plaintiff and the putative class members to, *inter alia*: (i) adequately review their marketing programs to ensure the Website is safe and secure; (ii) removing or

---

[4] U.S Department of Health and Human Services, *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Jul. 22, 2025) (noting that "HIPAA Identifiers" include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

CLASS ACTION COMPLAINT

disengaging technology that was known and designed to share the Private Information of visitors to the Website; (iii) obtain the prior written consent of Plaintiff and putative class members to disclose their Private Information to Meta, TikTok, and/or others before doing so; (iv) take steps to block the transmission of Plaintiff's and putative class members' Private Information through tracking pixels; (v) warn Plaintiff and the putative class members that their Private Information was being shared with third parties without express consent; and (vi) design and monitor the Website to maintain the security, confidentiality and integrity of patient Private Information.

35.     The Federal Trade Commission ("FTC") has also taken the stance that healthcare companies should not use tracking technologies to collect sensitive health information and disclose it to various platforms without the consumer's informed consent. In a bulletin entitled *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases*, the FTC addressed health-related businesses:

Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.

In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.

[Recent FTC enforcement actions such as] *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that practices like that may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[5]

36.    The FTC also noted that "[h]ealth information is not just about medications, procedures, and diagnoses. Rather, it is anything that conveys information—or enables an inference—about a consumer's health.  Indeed, [...] the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information."[6]

## II.    Consumers' Personal Information Has Real Market Value

37.    In 2001, FTC Commissioner Orson Swindle remarked that "the digital revolution  .  .  .  has given an enormous capacity to the acts of collecting and

---

[5] *See* Elisa Jillson, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases* (Sept. 4, 2023) (emphasis added), available at https://wp.nyu.edu/compliance_enforcement/2023/09/04/protecting-the-privacy-of-health-information-a-bakers-dozen-of-takeaways-from-ftc-cases/  (last visited Jul. 17, 2025).

[6] *Id.*

1   transmitting and flowing of information, unlike anything we've ever seen in our

2   lifetimes . . . [and] individuals are concerned about being defined by the existing data

3   on themselves."[7]

4          38.    Over two decades later, Commissioner Swindle's comments ring truer

    than ever, as consumer data feeds an information marketplace that supports a 26

5   billion dollar per year online advertising industry in the United States.[8]

6          39.    The FTC has also recognized that consumer data possesses inherent

7   monetary value within the new information marketplace, publicly stating that

8
            Most consumers cannot begin to comprehend the types and amount
9           of information collected by businesses, or why their information
            may be commercially valuable. Data is currency. The larger the data
            set, the greater potential for analysis – and profit.[9]
10
           40.    In fact, an entire industry exists while companies known as data
11
    aggregators purchase, trade, and collect massive databases of information about
12

13

14

15

_____

16  [7] Transcript, *The Information Marketplace* (Mar. 13, 2001), at 8-11, available at
    https://www.ftc.gov/sites/default/files/documents/public_events/information-
17  marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

18  [8] *See* Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, Wall
    Street    Journal    (Feb.    28,    2011),    available    at
19  https://www.wsj.com/articles/SB10001424052748703529004576160764037920274.

20  [9] Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, available at
    https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-
    exploring-privacy-roundtable/091207privacyroundtable.pdf

CLASS ACTION COMPLAINT

consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[10]

41.    The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[11]

42.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[12]

43.    Recognizing the severe threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies

---

[10] *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), available at http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ .

[11] N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), available at https://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html#:~:text=It's%20called%20the%20Acxiom%20Corporation,to%20know%20much%2C%20much%20more.

[12] Letter from Sen. J. Rockefeller IV, Sen. Cmtee. On Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) available at https://www.commerce.senate.gov/services/files/3bb94703-5ac8-4157-a97b-%20a658c3c3061c.

seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[13]

44.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs.   Thus, when companies who share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[14]

45.     The value of health data in particular is well-known and has been reported on extensively in the media. For example, a 2017 Time Magazine article 2017 entitled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar

---

[13] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), available at https://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

[14] *See* Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times (May 20, 2007), available at https://www.nytimes.com/2007/05/20/business/20tele.html.

---

CLASS ACTION COMPLAINT

Industry" described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[15]

46.    Similarly, a 2019 CNBC article observed that "patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[16]

47.    While credit card information can sell for as little as $1–$2 on the black market, PHI can sell for as much as $363.[17]

48.    Defendants are not alone in violating their customers' rights and jeopardizing their well-being in exchange for increased revenue. Disclosing customer and subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties has become a widespread practice. Unfortunately for consumers, this has come at the expense of their most basic privacy rights.

---

[15] Adam Tanner, "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," Time.com (Jan. 9, 2017), available at https://time.com/4588104/medical-data-industry/.

[16] Christina Farr, "Hospital execs say they are getting flooded with requests for your health data," CNBC (Dec. 18, 2019), available at https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

[17] Center for Internet Security, "Data Breaches: In the Healthcare Sector," available at https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/.

CLASS ACTION COMPLAINT

### III.   Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

49.     As the data aggregation industry has grown, so have consumer concerns regarding personal information.

50.     A survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies they cannot trust to protect their privacy online.[18] Additionally, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy.[19]

51.     Thus, as consumer privacy concerns grow, consumers increasingly incorporate privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.  In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[20]

---

[18] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf.

[19] *Id.*

[20] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), available at https://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html.

---

14

CLASS ACTION COMPLAINT

52.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[21]

53.     Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[22] As such, where a business offers customers a product or service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a product or service of less value than the product or service paid for.

IV.     **Defendants Use Tracking Pixels to Systematically Disclose its Patients' Private Information to Meta**

54.     As alleged below, whenever a person with a Meta account schedules a consultation on the Website, the pixel technology that Defendants intentionally

---

[21] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on Monetizing Privacy* (Feb. 27, 2012), available at https://www.enisa.europa.eu/publications/monetising-privacy.

[22] *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, available at https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf.

---

15

installed on the Website transmits the patient's Private Information to Meta without the patient's consent.

### A.    The Meta Pixel

55.    On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta."[23]  Meta is now the world's largest social media platform. To create a Meta account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

56.    The Meta Pixel, first introduced in 2013 as the "Facebook Pixel," is a string of code that companies can embed on their websites to monitor and track the actions taken by visitors to their websites and to report them back to Meta. This allows companies like Defendants to build detailed profiles about their customers and to serve them with highly targeted advertising.

57.    A Meta Pixel installed on a website allows Meta to "match [] website visitors to their respective Facebook User accounts."[24]  This is because Meta has assigned to each of its users a "FID" number – a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name.[25] Each transmission of information made from a company's website

---

[23] *See* Facebook, "Company Info," available at https://about.fb.com/company-info./.

[24] Meta, "Get Started – Meta Pixel," available at https://developers.facebook.com/docs/meta-pixel/get-started/.

[25] For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.

---

16

to Meta via the Meta Pixel is accompanied by, *inter alia*, the FID of the website's visitor.  Moreover, the Meta Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

58.     As Meta's developer's guide explains, installing the Meta Pixel on a website allows Meta to track actions that users with Meta accounts take on the site.[26]

59.     Meta's Business Tools Terms govern the use of Meta's Business Tools, including the Meta Pixel.[27]

60.     Meta's Business Tools Terms state that website operators may use Meta's Business Tools, including the Meta Pixel, to transmit the "Contact Information" and "Event Data" of their website visitors to Meta.

61.     Meta's Business Tools Terms define "Contact Information" as "information that personally identifies individuals, such as names, email addresses, and phone numbers . . . ."[28]

62.     Meta's Business Tools Terms state: "You instruct us to process the Contact Information solely to match the Contact Information against user IDs [e.g.,

---

[26]     Meta,     "About     Meta     Pixel,"     available     at https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[27]     Meta,     "Meta     Business     Tools     Terms,"     available     at https://www.facebook.com/legal/technology_terms.

[28] *Id*.

FIDs] ("Matched User IDs"), as well as to combine those user IDs with corresponding Event Data."[29]

63.    The Business Tools Terms define "Event Data" as, *inter alia*, "information that you share about people and the actions that they take on your websites and apps or in your shops, such as visits to your sites, installations of your apps, and purchases of your products."[30]

64.    Meta's website contains a list of "Standard Events" that can be captured on a website with the Meta Pixel enabled and then transmitted to Meta and logged. These include, but are not limited to:

- Complete Registration: Submitting information in exchange for a service provided by your business.  For example, signing up for an email subscription.

- Initiate Checkout: The start of a checkout process. For example, clicking a checkout button.

- Lead: A submission of information by a customer with the understanding that they may be contacted at a later date by your business. For example, submitting a form or signing up for a trial.

- Schedule: The booking of an appointment to visit one of your locations.[31]

65.    The Meta Pixel can also be used to transmit to Meta data collected on forms which appear on a website, including a consumer's first and last name, phone

---

[29] *Id.*

[30] *Id.*

[31] Meta, "Specifications for Meta Pixel Standard Events," available at https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

number, gender, birthdate, the city, state, or province in which they live, their Zip

or postal code, and their country of residence.[32]

66.    The Meta Pixel has "Advanced Matching" capabilities.  As described

on Facebook's website:

> Automatic advanced matching will tell your pixel to look for
> recognizable form fields and other sources on your website that
> contain information such as first name, last name and email address.
> The Meta Pixel receives that information along with the event, or
> action, that took place. This information gets hashed in the visitor's
> browser. We can then use the hashed information to more accurately
> determine which people took action in response to your ad. After
> matching, we promptly discard the hashed information.[33]

67.    Website operators can also program "Custom Events" into the Meta

Pixel, which enables them to send customized sets of data (e.g., specific actions taken

by visitors on a website) to Meta for analysis.[34]

68.    When website operators make transmissions to Meta through the

Meta Pixel, the visitor's FID, the URL of the website, and the Event Data are not

hashed or encrypted.

69.    Every website operator installing the Meta Pixel must agree to the

Meta Business Tools Terms.[35]

---

[32]    Meta,    "Advanced    Matching    –    Meta    Pixel,"    available    at
https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching.

[33]    Meta,    "About    advanced    matching    for    web,    available    at
https://www.facebook.com/business/help/611774685654668?id=1205376682832142.
[34]    Meta,    "About    standard    and    custom    website    events,"    available    at
https://www.facebook.com/business/help/964258670337005?id=1205376682832142.
[35]  *See id*.

70.    Simply put, if a company chooses to install the Meta Pixel on its website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track [] the people and type of actions they take."[36]

**B.    Defendants Knowingly Use the Meta Pixel to Transmit the Private Information of their Patients to Meta**

71.    Defendants have intentionally installed the Meta Pixel on the Website and used it to transmit their patients' Private Information to Meta.

72.    Defendants designed, developed, and published the Website from and within their offices in the state of California.  Defendants further implemented the Meta Pixel on the Website from and within their offices in the state of California.

73.    To schedule a consultation with one of Defendants' hair transplantation clinics, patients navigate to the Website and click on the "Schedule Free Consultation" button.

74.    The patient is then presented with a scheduler application which permits them to schedule a consultation with a hair transplantation clinic through the Website.

---

[36] Meta, "Retargeting: How to Advertise to Existing Customers with Ads on Facebook," available at https://www.facebook.com/business/goals/retargeting?checkpoint_src=any.

75.     On the first page of the scheduler, the patient enters his or her name, email, phone number, and address and clicks "Next Step", as pictured below:[37]



76.     On the second page of the scheduler, the patient selects the location of the hair transplantation clinic where they want to schedule the consultation, as pictured below:



77.     On the third page of the scheduler, the patient selects the date and time of the hair transplantation consultation.



78.     To book the consultation, the individual clicks a button reading "Book Appointment" at the bottom of the third page.



---

37 *See* Bosley, "Schedule Your Free Hair Loss Consultation," available at https://www.bosley.com/scheduler/ (last accessed Nov. 30, 2024).

CLASS ACTION COMPLAINT

79.    Defendants have installed and maintain the operation of the Meta Pixel on each page of this scheduler.

80.    Defendants have configured the Meta Pixel to transmit their patients' Private Information to Meta throughout the flow of the scheduler.

81.    Defendants have enabled the following Events in the Meta Pixel throughout the flow of the scheduler: PageView, Inquiry, PixelInitialized, FormFill, Lead, Scheduled Consult, and Submit Application.

82.    Each of these Events sends corresponding Event Data to Meta when they are triggered through a patient's navigation of the Website.

83.    Defendants send the patient's FID to Meta in each and every transmission to Meta, including in each transmission of Event Data.

84.    The FIDs are contained in the "c_user" cookie, which is sent to Meta with each transmission, as pictured below in an example taken from an outbound data transmission to Meta triggered by the webpage hosting the scheduler application:

Cookie:    datr=VFQaZ_Vl0nOSE0O9x7IGEWCU; ps_n=1; sb=a1QaZ_E8z2HK9DRC3NGA2b9y; locale=en_US; c_user=583866035;

85.    When a patient fills in their personal information on the first page of the scheduler (e.g., their first name, last name, email address, phone number, and

street address) and then clicks the "Next Step" button, the "Form Fill" event is triggered. Defendants transmit the fact that the "Form Fill" Event was triggered and its accompanying Event Data Meta along with the patient's FID. An excerpt from source code of the Website showing the execution of the "Form Fill" Event once a person clicks the "Book Appointment" button is reproduced below:

```
{
  "o": "4124",
  "r": "stable",
  "v": "2.9.179",
  "dl": "https%3A%2F%2Fwww.bosley.com",
  "ec": "5",
  "ev": "FormFill",
  "id": "1483207861706041".
```

86.    When a patient clicks the "Book Appointment" button at the end of the scheduler process, the "Scheduled Consult" Event is triggered. Defendants transmit the fact that the "Scheduled Consult" Event was triggered and its accompanying Event Data to Meta along with the patient's FID.  An excerpt from the source code of the Website showing the execution of the "Schedule Consult" Event when a person clicks the "Book Appointment" button is reproduced below:

```
{
  "o": "4124",
  "r": "stable",
  "v": "2.9.179",
  "dl": "https%3A%2F%2Fwww.bosley.com",
  "ec": "11",
  "ev": "Scheduled%20Consult",
  "id": "1483207861706041",
```

87.    When a patient clicks the "Book Appointment" button at the end of the scheduler process, the "Submit Application" Event is triggered. Defendants transmit

24

the fact that the "Submit Application" Event was triggered and the accompanying Event Data to Meta along with the patient's FID.  An excerpt from source code of the Website showing the execution of the "Submit Application" Event after a user clicks the "Book Appointment" button is reproduced below:

```
{
  "o": "4124",
  "r": "stable",
  "v": "2.9.179",
  "dl": "https%3A%2F%2Fwww.bosley.com",
  "ec": "10",
  "ev": "Submit%20Application",
  "id": "1483207861706041",
```

88.    Whenever Defendants make these transmissions to Meta, they disclose the data described above along with the FID of the patient who booked the appointment to Meta.

89.    In other words, when someone books an appointment with a hair transplantation clinic through the Website, Defendants disclose the person's identity and patient status to Meta.

90.    In this way, among other methods, Defendants knowingly disclose to Meta the Private Information of their patients.

91.    Defendants intentionally programmed the Website to include the Meta Pixel code to take advantage of the targeted advertising and other informational and analytical services offered by Meta.

92.    By installing the Meta Pixel their Website, Defendants permit Meta to secretly intercept their patients' communications about their confidential healthcare information, including their Private Information.

CLASS ACTION COMPLAINT

93.     With only a person's FID and the information transmitted to Meta through the Website's scheduler page—all of which Defendants knowingly and systematically provide to Meta—any ordinary person could learn the identity of the person to whom the FID corresponds and the fact that they requested hair transplantation consultation at a specific clinic location. This can be accomplished simply by accessing the URL www.facebook.com/[*insert the person's FID here*]/.

94.     The disclosed Private Information allows Meta to know that a specific patient is seeking confidential medical care and the type of medical care being sought—information Meta then sells to marketers through its advertising services.

95.     Defendants' practices of disclosing the Private Information of their patients to Meta continued unabated for many years prior to the filing of this action.

96.     At all times relevant hereto, whenever any person made an appointment through the Website, Defendants disclosed to Meta (*inter alia*) the fact that the person made an appointment with one of Defendants' hair transplantation clinics and the FID of the person who made the appointment.

97.     Defendants' practices of permitting Meta to intercept their patients' communications containing Private Information continued unabated for many years prior to the filing of this action.

98.     At all times relevant hereto, Defendants knew that the Meta Pixel was intercepting and disclosing its patients' Private Information to Meta.

99.     Defendants could easily have programmed the website so that none of its patients' Private Information was disclosed to Meta. Instead, Defendants chose

to program the Website to disclose as much of its patients' Private Information as possible to Meta.

100.    Before transmitting their patients' Private Information to Meta, Defendants failed to notify any of the patients that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

## C. The TikTok Pixel

101.    In September 2016, ByteDance launched a short-form video content platform, which is now known as "TikTok." TikTok is now the leading destination for short-form mobile videos.[38] To create a TikTok account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

102.    The TikTok Pixel, first introduced in 2018 is a unique piece of code that can placed on websites to share website events with TikTok, to measure traffic and ad campaign performance on the website, and to optimize ad campaigns for finding new customers. This allows companies like Defendants to build detailed profiles about their customers and to serve them with highly targeted advertising.

103.    The TikTok Pixel can be programmed to collect the following information: device platform, webpage URLs viewed, session ID, anonymous user ID, browser information, event codes, currency, email addresses, and phone numbers.

---

[38] TikTok, "About," available at https://www.tiktok.com/about?lang=en.

104.    Like the Meta Pixel, the TikTok Pixel can be calibrated with Events, including both Standard Events and Custom Events, to track activities taken by users on a webpage and send that information back to TikTok to assist with its marketing and analytics services.

105.    The Standard Events supported by the TikTok Pixel include: Add to Cart, Complete Registration, Schedule, Submit Application, FindLocation, Purchase, and Initiate Checkout.[39]

106.    When these Standard Events are enabled by a website operator in the TikTok Pixel, the website discloses the fact that an Event was triggered and the related Event Data to TikTok whenever such an Event is triggered by a user's actions on the site.

107.    Additionally, the TikTok Pixel installed on a company's website allows the company to share its customers' Contact Details with TikTok, or otherwise enable TikTok to collect Contact Details "for matching purposes" —that is, to match visitors to the website with their respective TikTok profiles.[40]  Contact Details are defined by TikTok as "information [a website operator] upload[s] or enable[s] TikTok to access in connection with [the website operator's] use of TikTok Business Products

---

[39]    Tiktok, "About Standard and Custom events,' available at https://ads.tiktok.com/help/article/standard-events-parameters?lang=en.

[40]    TikTok, "Advertising on TikTok," available at https://ads.tiktok.com/i18n/official/policy/product.

CLASS ACTION COMPLAINT

that enables an individual to be directly identified, such as their name, phone number or email address."[41]

108.    TikTok is able to match a website's visitor to their TikTok profile because it collects their contact information when they make a TikTok account, including their first and last name, email address, and phone number.

109.    TikTok assigns each of its users a unique and persistent identifier called a "User ID."  Each "User ID" is linked to an individual phone number that the user entered when creating their TikTok account.

110.    The TikTok Pixel has "Advanced Matching" capabilities, much like the Meta Pixel.  As stated by TikTok:

> Advanced Matching is a feature that helps you match customer information such as email and phone number along with actions people take on your website. You can match this information with events shared through the TikTok Pixel . . . .[42]

111.    Thus, when Advanced Matching is enabled by a website operator on the TikTok Pixel installed on their website, TikTok can match the email addresses and phone numbers entered by users of that website who have TikTok accounts to their identities.

112.    TikTok has used the TikTok Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all of its users'

---

[41] TikTok, "TikTok Business Products (Data) Terms," available at https://ads.tiktok.com/i18n/official/policy/business-products-terms.

[42] TikTok, "About Advanced Matching for Web," available at: https://ads.tiktok.com/help/article/advanced-matching-web.

CLASS ACTION COMPLAINT

interactions with any of the hundreds of thousands of websites across the Internet on which the TikTok Pixel is installed. TikTok then monetizes its database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

113. By installing the TikTok Pixel on the Website, Defendants permit TikTok to secretly intercept their patients' communications about their confidential healthcare information, including their Private Information.

114. By enabling the TikTok Pixel's Advanced Matching capabilities, Defendants ensure that TikTok is able to link their patients' Private Information to their individual identities.

115. Simply put, if a company chooses to install the TikTok Pixel on its website, both the company who installed it and TikTok (the recipient of the information it transmits) are then able to track the user's interactions with the website and personally identify those users.

### D. Defendants Knowingly Use the TikTok Pixel to Transmit the Private Information of their Patients to TikTok

116. Defendants use the TikTok Pixel to transmit the Private Information of its patients to TikTok.

117. In order to take advantage of the targeted advertising and other informational and analytical services offered by TikTok, Defendants intentionally programmed their Website (by following step-by-step instructions from TikTok's website) to include the TikTok Pixel code, which systematically transmits to TikTok personally identifiable information (a person's cell phone number and other unique

device information) of each person with a TikTok account who schedules a consultation on Defendants' Website along with the location of the hair transplantation clinic where that person scheduled the consultation.

118.   TikTok is able to "match" a website visitor with his or her TikTok account and personal identity, and identify the fact that the person scheduled consultation, with only a person's phone number. This matching is enabled by Defendants through the Advanced Matching capabilities of the TikTok Pixel, which Defendants have enabled on the Website.

119.   Defendants have, at minimum, enabled the following Events in the TikTok Pixel throughout the steps of the scheduler application on the Website: PageView, Lead, and CompleteRegistration.

120.   When a patient clicks the "Book Appointment" button at the end of the scheduler process, the "Complete Registration" Event is triggered.  This means that Defendants transmit the fact that the "Complete Registration" Event was triggered to TikTok along the accompanying Event Data and unique identifiers which permit TikTok to ascertain the patient's identity.  An excerpt from the "Payload" to TikTok from the Website showing the execution of the "Complete Registration" Event is reproduced below:

CLASS ACTION COMPLAINT

121.   When a patient clicks the "Book Appointment" button at the end of the scheduler process, the "Lead" and "PageView" Events are similarly triggered, and Defendants send the fact that those events were triggered, their accompanying Event Data, and unique identifiers permitting TikTok to ascertain the patient's identity to TikTok.

122.   Defendants have enabled the TikTok Pixel's Advanced Matching capabilities throughout the steps of the scheduler application on the Website, as shown in the following snippet of source code taken from the page hosting the scheduler application:

```
    };
4  !function(i, n, t, e) {
        var o, d, g = a()._static_map || [{
            id: "MTE0N2UyYjNkMA",
            map: {
                AutoAdvancedMatching: !1,
                Shopify: !1,
                Monitor: !1,
                CompetitorInsight: !1,
                JSBridge: !1,
                EventBuilderRuleEngine: !1
            }
```

123.   Thus, Defendants disclose to TikTok the fact that their patients have scheduled an appointment with a hair transplantation clinic and intentionally calibrated the TikTok Pixel to enable TikTok to personally identify each one of their patients who has scheduled a consultation.

124.   Defendants' practices of disclosing the Private Information of their patients to TikTok continued unabated at all times relevant to this action.

CLASS ACTION COMPLAINT

125.    At all times relevant hereto, Defendants knew the TikTok Pixel was disclosing its patients' Private Information to TikTok and intended to make those disclosures.

126.    Defendants could easily have programmed the website so that none of its patients' Private Information was disclosed to TikTok. Instead, Defendants chose to program the Website to disclose as much of its patients' Private Information as possible to TikTok.

127.    Before transmitting its patients' Private Information to TikTok, Defendants failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

128.    By intentionally disclosing to TikTok Plaintiff's and its other patients' phone numbers and other Contact Details together with the fact that the patient booked a hair transplantation consultation and the location of the clinic where the patient booked that consultation, Defendants violated the law on an enormous scale.

## V.    Defendants' Use of the Pixels Violates HIPAA

129.    The disclosure and interception of Plaintiff's and the putative class members' Private Information via the tracking contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.[43]

---

[43] U.S. Department of Health and Human Services, "The HIPAA Privacy Rule," available at https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

130.    The HIPAA Privacy Rule sets forth policies to protect all Individually Identifiable Health Information ("IIHI") that is held or transmitted by covered entities such as Defendants.  These are the 18 HIPAA Identifiers that are considered personally identifiable information because they can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes PHI.[44]

131.    Further to the HIPAA Privacy Rule, covered entities such as Defendants are simply ***not*** permitted to use tracking technology tools (like tracking pixels) in a way that exposes customers' Private Information to any third party without express and informed consent.

132.    Under Federal Law, a healthcare provider or its business associate may not disclose personally identifiable, non-public medical information about a patient,

---

[44] Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html   (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[45]

133.  Guidance from the United States Department of Health and Human Services ("HHS") instructs healthcare providers that patient status alone is also protected by HIPAA.

134.  The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

135.  Here, Defendants provided patient information to third parties in violation of the Privacy Rule.  HHS has repeatedly instructed for years that patient status is protected under the Privacy Rule:

- "The sale of a patient list to a marketing firm" is not permitted under HIPAA.  65 Fed. Reg. 82717 (Dec. 28, 2000).

- "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list.  67 Fed. Reg. 53186 (Aug. 14, 2002).

- It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers.  78 Fed. Reg. 5642 (Jan. 25, 2013).

[45] 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

136.   In addition, the Office for Civil Rights at HHS' Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."[46]

137.   The Bulletin further explained that health care providers violate HIPAA when they use tracking technologies that disclose an individual's identifying information (like an IP address) even if no treatment information is included and even if the individual does not have a relationship with the health care provider:

> **How do the HIPAA Rules apply to regulated entities' use of tracking technologies?**
>
> Some regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's website or mobile app, such as information that the individual types or selects when they use regulated entities' websites or mobile apps. The information disclosed might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code.
>
> IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.[47]

---

[46] U.S. Department of Health and Human Service, "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates," available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[47] *Id.*

138.    HIPAA applies to Defendants' webpages with tracking technologies even outside the patient portal:

**Tracking on unauthenticated webpages**

Regulated entities may also have unauthenticated webpages, which are webpages that do not require users to log in before they are able to access the webpage, such as a webpage with general information about the regulated entity like their location, visiting hours, employment opportunities, or their policies and procedures… in some cases, tracking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to the tracking technology vendors. Regulated entities are required to "[e]nsure the confidentiality, integrity, and availability of all electronic PHI the [regulated entity] creates, receives, maintains, or transmits." Thus, regulated entities that are considering the use of online tracking technologies should consider whether any PHI will be transmitted to a tracking technology vendor, and take appropriate steps consistent with the HIPAA Rules.[48]

139.    HHS explained that, if the online tracking technologies on the webpages have access to information that relates to an individual's past, present, or future health, health care, or payment for health care, that is a disclosure of PHI, for example:

[I]f an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care.

---

[48] *Id.*

140.    The Bulletin is not a pronouncement of new law, but instead a reminder to covered entities and business associates of their longstanding legal obligations under existing guidance.

141.    The Bulletin notes that "it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors," then explains how online tracking technologies violate the same HIPAA rules that have existed for decades.[49]

## VI.    Patients' Reasonable Expectation of Privacy

142.    Plaintiff and the putative class members were aware of Defendants' duty of confidentiality when they scheduled appointments on the Website.

143.    At all times when Plaintiff and putative class members provided their PII and PHI to Defendants, each had a reasonable expectation that the information would remain confidential and that Defendants would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

144.    Privacy polls and studies show that the overwhelming majority of Americans consider obtaining someone's affirmative consent before a company collects and shares that person's data to be one of the most important privacy rights.

145.    For example, a recent Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe

---

[49] *Id.*

CLASS ACTION COMPLAINT

those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[50]

146.    Personal data privacy was material to Plaintiff and the putative class members when they decided to book an appointment for hair transplantation consultations through the Website.

## VII.    Defendants Were Enriched & Benefitted From the Use of the Pixels and Unauthorized Disclosures

147.    The primary motivation and a determining factor in Defendants' interception and disclosure of Plaintiff's and the putative class members' Private Information was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data for advertising in the absence of express written consent. Defendants' use of the Private Information for marketing and revenue generation was a violation of HIPAA and an invasion of privacy.

148.    Defendants used the tracking pixels on the Website for their own purposes of marketing, advertising, and thereby generating additional profits.

149.    Based on information and belief, Defendants received compensation from third parties like Meta and TikTok in the form of enhanced advertising services and more cost-efficient marketing on third-party platforms in exchange for disclosing patients' Private Information.

150.    "Retargeting" is a form of online marketing that targets users with ads

---

[50] Consumer Reports, "Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds," (May 11, 2017), available at https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

CLASS ACTION COMPLAINT

based on their previous Internet communications and interactions.

151. Upon information and belief, Defendants retargeted patients and potential patients to get more people to book their services. These patients include Plaintiff and the putative class members.

152. By utilizing the pixels, Defendants' cost of advertising and retargeting was reduced, thereby benefitting and enriching Defendants.

153. Defendants received substantial, quantifiable value from their use of Plaintiff's and the putative class members' PII and PHI by increasing the efficacy of their advertising to induce more consumers to book their services.

## TOLLING, CONCEALMENT & ESTOPPEL

154. Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment of the operation of the Meta Pixel and TikTok Pixel into the Website.

155. The Meta Pixel, TikTok Pixel, and other tracking tools on the Website were, and are, entirely invisible to visitors.

156. Through no fault or lack of diligence, Plaintiff and the putative class members were deceived and could not reasonably discover Defendants' deception and unlawful conduct.

157. Plaintiff and the putative class members were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

158. Plaintiff and the putative class members were shown no disclaimer or

warning that their Private Information would be disclosed to or intercepted by any unauthorized third party without their consent.

159.    Plaintiff and the putative class members did not consent to their Private Information being disclosed or intercepted by unauthorized third parties.

160.    Defendants had exclusive knowledge that the Website incorporated the Meta Pixel and TikTok Pixel and yet failed to disclose to patients, including Plaintiff and the putative class members, that by scheduling a consultation for hair transplantation surgery on Defendants' Website, Plaintiff's and the putative class members' Private Information would be disclosed to or intercepted by Meta, TikTok, and other unauthorized third parties.

161.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

162.    The earliest that Plaintiff or the putative class members, acting with due diligence, could have reasonably discovered Defendants' conduct would have been shortly before the filing of this Complaint.

163.    Under the circumstances, Defendants were under a duty to disclose the nature, significance, and consequences of its collection, disclosure, interception, and treatment of the patients' Private Information.  Accordingly, Defendants are estopped from relying on any statute of limitations.

## CLASS ACTION ALLEGATIONS

164.    This action is brought by the named Plaintiff on his own behalf and on behalf of a proposed Class of persons similarly situated under Federal Rules of Civil

41

Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

165.    The Class that Plaintiff seeks to represent is defined as follows:

**The Class**

All natural persons who used the Website to schedule a consultation at a hair transplantation clinic and whose Private Information was disclosed to Meta, TikTok, or any other unauthorized third party.

166.    In addition to the claims asserted on behalf of the Class, Plaintiff asserts claims on behalf of the Maryland Subclass, which is defined as follows:

**The Maryland Subclass**

All natural persons residing in Maryland who used the Website to schedule a consultation at a hair transplantation clinic and whose Private Information was disclosed to Meta, TikTok, or any other unauthorized third party.

167.    Class members are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in at least the tens of thousands.   The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the membership records of Defendants.

168.    Common questions of law and fact exist for all putative class members and predominate over questions affecting only individual class members.  Common legal and factual questions include but are not limited to (a) whether Defendants embedded Meta Pixel, TikTok Pixel, or other trackers on the Website; (b) how Defendants configured the Meta Pixel, TikTok Pixel, or any other trackers on the Website; (c) whether Defendants knowingly disclosed Plaintiff's and that putative

class members' Private Information to Meta, TikTok, or any other third parties; (d) whether Defendants' conduct violates federal or state law; and (e) whether Plaintiff and each of the putative class members is entitled to damages; (f) whether Plaintiff and each of the putative class members is entitled in injunctive relief; (g) whether Defendants knowingly made false representations regarding their confidentiality obligations.

169.    The named Plaintiff's claims are typical of the claims of the putative class in that Defendants' conduct toward the putative class is the same.    That is, Defendants embedded the pixel trackers on the Website to monitor and track actions taken by Plaintiff and class members on the Website and report these actions and communications to Meta, TikTok, and potentially other third parties.    Further, the named Plaintiff and the putative class members suffered invasions of their statutorily protected right to privacy, as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Defendants' uniform and wrongful conduct in intentionally disclosing and interception their Private Information.

170.    Plaintiff is an adequate representative of the putative class because he is interested in the litigation; his interests do not conflict with those of the putative class members he seeks to represent; he has retained competent counsel experienced in prosecuting class actions and intends to prosecute this action vigorously.    Plaintiff and his counsel will fairly and adequately protect the interests of all putative class members.

171.    The class mechanism is superior to other available means for the fair and efficient adjudication of putative class members' claims. Each individual putative class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues.   Individualized litigation also presents a potential for inconsistent or contradictory judgments.   In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication of the common questions of law and fact, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

172.    Finally, all members of the proposed class are readily ascertainable. Defendants have access to the putative class members' names, addresses, phone numbers, and email addresses.  Defendants are aware of all individuals who have scheduled appointments through the Website, as well as all individuals whose Private Information was disclosed to or intercepted by Meta, TikTok, and other third parties.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

# COUNT I
## Violation of the Electronic Communications Privacy Act
## 18 U.S.C. § 2511(1), *et seq.*
## (*On Behalf of Plaintiff & the Class*)
## (*Against All Defendants*)

173.    Plaintiff repeats the allegations asserted in the preceding paragraphs as if fully set forth herein.

174.    The Electronic Communications Privacy Act ("ECPA") protects both sending and receipt of communications.

175.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

176.    The transmissions of Plaintiff's Private Information and related communications to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

177.    <u>Electronic Communications</u>.  The transmission of Private Information and related communication between Plaintiff and the putative class members and Defendants' Website are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

178.   Content.   The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

179.   The intercepted communications include, but are not limited to, communications to/from Plaintiff and putative class members regarding PII and PHI, diagnosis of certain conditions, and treatment for such conditions. Furthermore, Defendants intercepted the "contents" of Plaintiff's communications in at least the following forms:

> a.   The parties to the communications;
>
> b.   Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;
>
> c.   The fact that the Plaintiff and putative class members scheduled a consultation at a hair transplantation clinic;
>
> d.   The location of the hair transplantation clinic where Plaintiff and the putative class members scheduled their hair transplantation consultation;
>
> e.   Information that informs third parties of the general subject of communications that Defendants sent back to patients in response to requests to schedule a consultation.

180.   Electronical, Mechanical or Other Device.   The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

181.    The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

      a.    Plaintiff's and the putative class members' web browsers;

      b.    Plaintiff's and the putative class members' computing devices

      c.    Defendants' web-servers; and

      d.    The tracking pixel code deployed by Defendants to effectuate the sending and acquisition of patient communications.

182.    <u>Interception</u>.  The ECPA defines "interception" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

183.    By utilizing and embedding the tracking pixels on the Website, Defendants intentionally permitted the interception, caused the interception, aided the interception, and procured persons (including Meta and TikTok) to intercept, the electronic communications of Plaintiff and the putative class members, in violation of 18 U.S.C. § 2511(1)(a).

184.    Specifically, Defendants intentionally permitted the interception, caused the interception, aided the interception, and procured persons (including Meta and TikTok) to intercept Plaintiff's and the putative class members' electronic communications via the tracking pixels, which tracked, stored, and unlawfully disclosed Plaintiff's and the putative class members' Private Information to third parties.

185.    The intercepted communications include, but are not limited to,

47

communications between Plaintiff and the putative class members and Defendants regarding PII and PHI, including their sensitive medical conditions, their requests to schedule consultations, the location of the consultations they scheduled, their first and last names, emails, phone numbers, and addresses.

186.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and the putative class members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

187.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and the putative class members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

188.    <u>Unauthorized Purpose</u>. Defendants intentionally intercepted the contents  of Plaintiff's and the putative class members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, negligence, wiretapping laws, invasion of privacy, intrusion upon seclusion, the California Confidentiality of Medical Information Act ("CIMA"), the California Invasion of Privacy Act ("CIPA"), and HIPAA, among others.

189.    As alleged above, Defendants violated a provision of HIPAA,

specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing IIHI to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider . . . (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

190.    Plaintiff's and the putative class members' information that Defendants disclosed to third parties qualifies as IIHI. Defendants intentionally used wire or electronic communications to intercept Plaintiff's and the putative class members' IIHI in violation of 42 U.S.C. § 1320d-6.

191.    Additionally, Defendants violated 42 U.S.C. § 1320d-6 by:

- Using, and causing to be used, unique health identifiers, including cookie identifiers, unique identifiers (including FIDs), Contact Details, and other personally identifying information (including names, email addresses, phone numbers, and addresses) associated with specific patients without patient authorization; and

- disclosing IHII to Meta and TikTok without patient authorization.

192.    Defendants' conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendants' use of the tracking pixels was for Defendants' commercial advantage to increase revenue from existing patients and gain new patients.

193.    Defendants acquired patient communications that were used and

49

disclosed to Meta and TikTok for the purpose of committing criminal and tortious acts in violation of the laws of the United States and individual states nationwide as set forth herein. These violations include, but are not limited to:

        a.      Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

        b.      Invasion of Privacy;

        c.      Intrusion Upon Seclusion;

        d.      Negligence;

        d.      Maryland Wiretap Act, Md. Code Ann., Cts. & Jud. Proc. § 10-402;

        e.      California Invasion of Privacy Act, Cal. Penal Code § 631;

        f.      California Confidentiality of Medical Information Act, Cal. Civ. Code § 631 56.06.

194.   Defendants are not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that they were participants in Plaintiff's and the putative class members' communications about their Private Information on the Website. Defendants do not fall under the exception because they used their participation in these communications to improperly share Plaintiff's and the putative class members' Private Information with Meta, TikTok, and other third parties that did not participate in these communications, without the knowledge or consent of Plaintiff and the putative class members.

195.   As such, Defendants cannot viably claim any exception to ECPA liability.

196.    Plaintiff and the putative class members have suffered damages as a direct and proximate result of Defendants' invasion of privacy:

a.    Learning that Defendants had intruded upon, intercepted, transmitted, shared, and used their PII and PHI (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and medical bills) for commercial purposes has caused Plaintiff and the putative class members to suffer emotional distress;

b.    Defendants received substantial financial benefits from their use of Plaintiff's and the putative class members' PII and PHI without providing any value or benefit to Plaintiff or the putative class members;

c.    Defendants received substantial, quantifiable value from their use of Plaintiff's and the putative class members' PII and PHI, such as understanding how people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiff or the putative class members;

d.    Defendants have failed to provide Plaintiff and the putative class members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e.    Defendants diminished the value of Plaintiff's and the putative class members' PII and PHI and caused a loss of privacy by disclosing sensitive and confidential information, such as patient status and appointments that Plaintiff and the putative class members intended to remain private.

197.    Defendants intentionally used the wire or electronic communications to track and utilize Plaintiff's and the putative class members' Private Information for financial gain, including by serving them targeted advertising and retargeting them. Meta and TikTok then used the communications to build consumer profiles

of Plaintiff and the putative class members and sell that information to other advertisers interested in targeting consumers with similar needs.

198.    Defendants were not acting under color of law to intercept Plaintiff's and the putative class members' wire or electronic communications.

199.    Plaintiff and the putative class members did not authorize Defendants to acquire, using the tracking pixels, the content of their communications for purposes of invading their privacy.

200.    Any purported consent that Defendants received from Plaintiff and putative class members was not valid.

201.    In acquiring and transmitting to Meta, TikTok, and other third parties the content of Plaintiff's and the putative class members' communications relating to the Website, Defendants' purpose was tortious, criminal, and designed to violate federal and state legal provisions, including knowingly intruding into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person.

202.    As a result of Defendants' violation of the ECPA, Plaintiff and the putative class members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

1

2

3

**COUNT II**
**Violation of the California Confidentiality of Medical Information Act**
**Cal. Civ. Code § 56, *et seq.***
**(*On Behalf of Plaintiff & the Class*)**
**(*Against All Defendants*)**

4      203.    Plaintiff repeats and incorporates the allegations contained in the

5

paragraphs above as if fully set forth herein.

6      204.    Defendants are subject to the California Confidentiality of Medical

7

Information Act ("CMIA") pursuant to California Civil Code § 56.10 because they are

8

"provider[s] of health care" as defined by California Civil Code § 56.05(p): they

9

operate surgical centers, maintain medical information, offer software to consumers

10

designed to maintain medical information for the purposes of communications with

doctors, receipt of diagnosis, treatment, or management of medical conditions.

11      205.    Defendant Bosley is also subject to the CMIA pursuant to California

12

Civil Code § 56.10 because it is a "contractor" as defined by California Civil Code §

13

56.05(d); it provides services to Defendant BMG including marketing and patient

14

intake pursuant to contracts between the entities.

15      206.    Defendant Bosley is also subject to the CMIA pursuant to California

16

Civil Code § 56.06(1) because it is organized for the purpose of maintaining medical

17

information in order to make the information available to an individual or a provider

18

of healthcare, for purposes of allowing the individual to manage the individual's

information, or for the diagnosis and treatment of the individual.

19      207.    Defendant Bosley maintains its headquarters and principal place of

20

business in Beverly Hills, CA and has intentionally directed business activities in

---

53

and towards California, including by contracting with California corporations (including Defendant BMG), publishing the Website www.bosley.com in California, installing the Meta Pixel and TikTok Pixel on the Website in California, and facilitating patient intakes for Bosley Medical Group in California. These activities have harmed California residents and individuals residing outside of California alike.

208. Defendant BMG is a California professional medical corporation which has intentionally directed business activities in and towards California, including by contracting with California corporations (including Defendant Bosley).

209. California Civil Code § 56.10 states, in pertinent part, that "[n]o provider of health care . . . shall disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization . . . ."

210. Section 56.101 of the CMIA states, in pertinent part, that "[a]ny provider of health care . . . who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties . . ." Cal. Civ. Code §§ 56.10, 56.101.

211. Plaintiff's and the putative class members' Private Information constitutes "medical information" under the CMIA because it consists of individually identifiable information in possession of, and derived from, a provider of healthcare regarding Plaintiff's and the putative class members' medical history, test results, mental or physical condition, and/or treatments.

212.    Defendants violated Cal. Civ. Code § 56.10 because they failed to maintain the confidentiality of their patients' medical information, and instead "disclose[d] medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization" by soliciting, intercepting, and receiving Plaintiff's and the putative class members' Private Information, and sharing it with advertisers and for advertising purposes. Specifically, Defendants knowingly, willfully, or negligently disclosed Plaintiff's and the putative class members' medical information to Meta and TikTok, allowing Meta and TikTok to advertise to and specifically target Plaintiff and the putative class members based upon their extremely sensitive Private Information.

213.    Defendants violated Cal. Civ. Code § 56.101 because they knowingly, willfully, or negligently failed to create, maintain, preserve, store, abandon, destroy, and dispose of medical information in a manner that preserved its confidentiality by soliciting, intercepting, and receiving Plaintiff's and the putative class members' Private Information, and sharing it with advertisers and for advertising purposes, as well as Meta's, TikTok's, and Defendants' financial gain.

214.    Defendants intentionally embedded the tracking pixels, which facilitate the unauthorized sharing of Plaintiff's and the putative class members' Private Information.

215.   Defendants violated Cal Civ. Code § 56.36(b) because they negligently released confidential information and records concerning Plaintiff and the putative class members in violation of their rights under the CMIA.

216.   As a direct and proximate result of Defendants' misconduct, Plaintiff and the putative class members had their private communications containing information related to their sensitive and confidential Private Information intercepted, disclosed, and used by third parties.

217.   As a result of Defendants' unlawful conduct, Plaintiff and the putative class members suffered an injury, including violation to their rights of privacy, loss of the privacy of their Private Information, loss of control over their sensitive personal information, and suffered aggravation, inconvenience, and emotional distress. Plaintiff and the putative class members also lost the value of their Private Information as a result of Defendants' unfair business practices, specifically when Defendants' conduct prevented them from monetizing their medical or otherwise personal information and data on their own terms.

218.   Plaintiff and the putative class members are entitled to: (a) nominal damages of $1,000 per violation; (b) actual damages, in an amount to be determined at trial; (c) reasonable attorneys' fees, and costs.

**COUNT III**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code §§ 631, 632**
***(On Behalf of Plaintiff & the Class)***
***(Against All Defendants)***

219.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

220.    The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, et seq. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630.

221.    Cal. Penal Code § 631 imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or

1   persons to unlawfully do, or permit, or cause to be done any of the acts or things

2   mentioned above in this section."

3       222.    Cal. Penal Code § 632 prohibits "intentionally and without the consent

4   of all parties to a confidential communication," the "use[] [of] an electronic

5   amplifying or recording device to eavesdrop upon or record the confidential

6   communication."

7       223.    Section 632 defines "confidential communication" as "any

8   communication carried on in circumstances as may reasonably indicate that any

9   party to the communication desires it to be confined to the parties thereto[.]"

10      224.    Defendants are persons for purposes of § 631 and 632.

11      225.    Defendant Bosley maintains its principal place of business in

12  California, where it contrived and effectuated the interception and use of the

13  contents of Plaintiff's and the putative class members' communications.

14      226.    Defendant BMG is a California professional medical corporation.

15      227.    The Meta Pixel, the TikTok Pixel, Plaintiff's and putative class

16  members' browsers and mobile applications, and Plaintiff's and the putative class

17  members' computing and mobile devices are a machine, instrument, contrivance, or

18  other manner of communicating.

19      228.    At all relevant times, Defendants intentionally tapped or made

20  unauthorized connections with, the lines of internet communication between

    Plaintiff and the putative class members and the Website without the consent of all

    parties to the communication.

229.    The interception of Plaintiff's and the putative class members' communications was without authorization and consent from the Plaintiff and putative class members. Accordingly, the interception was unlawful and tortious.

230.    Plaintiff's and the putative class members' communications to Defendants, including their sensitive medical information including their medical conditions, treatments, requests to schedule consultations, and the locations of those consultations were confidential communications for the purposes of § 632, including because Plaintiff and the putative class members had an objectively reasonable expectation of privacy in this data

231.    Plaintiff and the putative class members expected their communications to Defendants to be confined to those parties. Plaintiff and the putative class members did not expect third parties, and specifically Meta or TikTok, to secretly eavesdrop upon or record this information and their communications.

232.    The Meta Pixel and the TikTok Pixel are electronic amplifying or recording devices for purposes of § 632.

233.    At no time did Plaintiff or the putative class members consent to Defendants' conduct, nor could they reasonably expect that their communications with Defendants would be overheard or recorded by Meta or TikTok.

234.    Plaintiff and the putative class members seek statutory damages in accordance with Cal. Penal Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff

1  and the putative class members in an amount to be proven at trial, as well as

2  injunctive or other equitable relief.

3      235.    Plaintiff and the putative class members have also suffered irreparable

4  injury from these unauthorized acts. Plaintiff's and the putative class members'

5  sensitive data have been collected, viewed, accessed, and stored by Meta, and due to

6  the continuing threat of such injury, Plaintiff and the putative class members have

7  no adequate remedy at law. Thus, Plaintiff and the putative class members are

   entitled to injunctive relief.

8                        **COUNT IV**
                         **Negligence**
9      (***On Behalf of Plaintiff & the Class***)
                  (***Against Defendants***)
10

11     236.    Plaintiff repeats the allegations contained in the foregoing paragraphs

12  as if fully set forth herein.

13     237.    Defendants required Plaintiff and the putative class members to

14  submit non-public personal information in order to obtain healthcare/medical

   services.

15     238.    By collecting and storing this data in their computer systems,

16  Defendants had a duty of care to use reasonable means to secure and safeguard their

17  computer systems—and Plaintiff's and the putative class members' Private

18  Information held therein—to prevent disclosure of the information, and to safeguard

19  the information from disclosure to third parties.

20     239.    Defendants owed a duty of care to Plaintiff and putative class members

   to provide data security consistent with industry standards to ensure that its

systems and networks, and the personnel responsible for them, adequately protected the Private Information.

240.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between them and their patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law.

241.    Defendants' duty to use reasonable security measures under HIPAA required them to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the healthcare, medical, and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

242.    In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

243.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

CLASS ACTION COMPLAINT

244.    Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff's and the putative class members' Private Information.   The specific negligent acts and omissions committed by Defendants include, but are not limited to, (1) failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and the putative class members' Private Information; and (2) allowing unauthorized access to Plaintiff's and the putative class members' Private Information.

245.    It was foreseeable that Defendants' failure to use reasonable measures to protect Plaintiff's and the putative class members' Private Information would result in injury to Plaintiff and the putative class members.

246.    Plaintiff and the putative class members are entitled to compensatory, nominal, and/or punitive damages.

247.    Defendants' negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and the putative class members in an unsafe and unsecure manner. Therefore, Plaintiff and the putative class members are also entitled to injunctive relief requiring Defendants to strengthen their data security practices.

**COUNT V**
**Violation of the Maryland Wiretap Act**
**Md. Code Ann., Cts. & Jud. Proc. § 10-402**
***(On Behalf of Plaintiff & the Maryland Subclass)***
***(Against All Defendants)***

248.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

CLASS ACTION COMPLAINT

249.    The Maryland Wiretap Act (the "MWA") prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the willful disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the willful use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. Md. Code Ann., Cts. & Jud. Proc. § 10-402.

250.    Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. Md. Code Ann., Cts. & Jud. Proc. § 10-410(a).

251.    Defendants qualify persons under the Act because they are corporations. *See* Md. Code Ann., Cts. & Jud. Proc. § 10-401(14) (defining "[p]erson" as "any individual, partnership, association, joint stock company, trust or corporation."

252.    "Intercept" is defined as any "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical or other device."  Md. Code Ann., Cts. & Jud. Proc. § 10-401(10).

253.    "Contents" is defined as when "used with respect to any wire, oral, or

63

electronic communication, includes any information concerning the identity of the parties to the communication or the existence, substance, purport, or meaning of that communication." Md. Code Ann., Cts. & Jud. Proc. § 10-401(4).

254.    "Electronic Communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system." Md. Code Ann., Cts. & Jud. Proc. § 10- 401(5)(i).

255.    Defendants willfully engaged in and continue to engage in intercepting communications by aiding others (including Meta and TikTok) to secretly record the contents of Plaintiff and the putative class members' electronic communications.

256.    The intercepting devices in this case include, but are not limited to:

    a.    Plaintiff's and the putative Maryland subclass members' personal computing devices;

    b.    Plaintiff's and the putative Maryland subclass members' web browsers;

    c.    Plaintiff's and the putative Maryland subclass members' browser-managed files;

    d.    The Meta Pixel;

    e.    The TikTok Pixel;

    f.    Internet cookies;

    g.    Defendants' computer servers;

    h.    Third-party source code utilized by Defendants;

       i.     Computer servers of third parties (including Meta and TikTok) to which Plaintiff's and the putative Maryland subclass members' communications were disclosed.

257. Defendants willfully aided in, and continue to aid in, the interception of contents in that data from the communications between Plaintiff and/or the putative Maryland subclass members and Defendants that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

258. Defendants aided in the interception of "contents" in at least the following forms:

     a.     The parties to the communications;

     b.     PII such as Plaintiff's and the putative Maryland subclass members' IP addresses, Facebook IDs, browser fingerprints and other unique identifiers;

     c.     The fact that Plaintiff and the putative Maryland subclass members booked a hair transplantation consultation, the location of the clinic where they booked that consultation, and their names, addresses, phone numbers, and email addresses;

     d.     The precise text of buttons clicked by Plaintiff and the putative Maryland subclass members;

     e.     The dates and times when Plaintiff and the putative Maryland subclass members accessed the Website, including when they booked their consultations;

     f.     Descriptive information about the webpages visited by Plaintiff and the putative Maryland subclass members including the title of the webpage;

     g.     Information that is a general summary or informs third parties of the general subject of communications that Defendants send back to customers in response to search queries and requests for

information about specific medical conditions, treatments, and medical tests sought;

h.    Any other content that Defendants has aided third parties in scraping from its webpages or communication forms on the Website.

259.    Defendants willfully procure and embed the Meta Pixel and TikTok Pixel (and other tracking pixels) on the Website to spy on, automatically and secretly, and intercept its Website visitors' electronic interactions communications in real time.

260.    Plaintiff's and the putative Maryland subclass members' electronic communications were/are intercepted contemporaneously with their transmission.

261.    Plaintiff and the putative Maryland subclass members reasonably expected that their Private Information was not being intercepted, recorded and disclosed to Meta, TikTok, and other third parties.

262.    Plaintiff and the putative Maryland subclass members did not consent to having their Website communications, which include their Private Information, wiretapped.

263.    No legitimate commercial purpose was served by Defendants' willful and intentional disclosure of Plaintiff's and the putative Maryland subclass members' Private Information to Meta and TikTok.

264.    Plaintiff's and the putative Maryland subclass members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Private Information,

including using their sensitive medical information to develop marketing and advertising strategies.

265.    Pursuant to Md. Code Ann., Cts. & Jud. Proc. § 10-410 Plaintiff and the Maryland Subclass members seek (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

266.    Defendants' conduct is ongoing, and Defendants continue to unlawfully intercept the communications of Plaintiff and the putative Maryland subclass members any time they visit Defendants' Website.   Plaintiff and the putative Maryland subclass members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT VI
### Violation of the Maryland Consumer Protection Act
### Md. Comm. Law Code Ann., § 13-101
### (*On Behalf of Plaintiff & the Maryland Subclass*)
### (*Against All Defendants*)

267.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

268.    The Maryland Consumer Protection Act ("MCPA") provides that a person may not engage in any unfair and deceptive trade practice in the sale, lease rental, loan, or bailment, or offer for sale, lease, rental, loan, or bailment of any consumer services, including, "failure to state a material fact if the failure deceives or tends to deceive," and "[d]eception, fraud, false pretense, false premise,

misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . the promotion or sale of any . . . consumer service," Md. Code Ann., Com. Law §13-301, regardless of whether the consumer is actually deceived or damaged, Md. Code Ann., Com. Law §13-302. Defendants engaged in unfair and deceptive practices that violated the MCPA as described above.

269.    Plaintiff and the Maryland Subclass members and Defendants are all "[p]erson[s]" within the meaning of the MCPA, Md. Code Ann., Com. Law §13-101(h).

270.    Defendants offered and promoted consumer services by its offers of the Webiste, which allows users to schedule an appoint, contact Defendants, find a hair transplantation clinic, and find a Bosley location

271.    Defendants participated in and engaged in deceptive business or trade practices prohibited by the MCPA by failing to state and knowingly concealing, suppressing, and omitting the material fact that Defendants was disclosing Plaintiff's and the Maryland Subclass members' private communications to third parties.

272.    That Defendants incorporated third party analytics and advertising tracking technology on the Website and disclosed Plaintiff's and the Maryland Subclass members' private communications through that technology was a material fact because of consumers' expectations that this type of information would remain private.

273.   Defendants knowingly and intentionally concealed, suppressed, and omitted material facts in connection with its disclosure of Plaintiff's and the Maryland Subclass members' private communications by, among other things, failing to disclose that it intentionally incorporated third party analytics and advertising tracking technology on the Website through which it disclosed Plaintiff's and the Maryland Subclass members' private communications to third parties. Defendants omitted such material facts with the intent that Plaintiff and the Maryland Subclass members rely on the same in using the Website.

274.   Defendants at all times knew that the third party analytics and advertising tracking technology would disclose Plaintiff's and the Maryland Subclass members' private communications from Website the to third parties, including Meta and TikTok.

275.   Defendants knew or should have known that its conduct violated the MCPA.

276.   Plaintiff and the Maryland Subclass members reasonably relied on Defendants to protect and safeguard their private communications and to promptly and adequately inform them of the unauthorized disclosure of same.

277.   Plaintiff and the Maryland Subclass members had no way of discerning Defendant's concealment, suppression, and omission of these material facts when they used the Website because Plaintiff and the Maryland Subclass members did not have access to Defendants' exclusive and superior knowledge about the Website's

design and incorporation of third party analytics and advertising tracking technology.

278.    Plaintiff and the Maryland Subclass members reasonably relied on Defendant's concealment, suppression, and omissions of material facts because they would not have used the Website to communicate with Defendants, and provided their Private Information to Defendants had they known that Defendants were disclosing this information to third parties, including Meta and TikTok, through the analytics and advertising tracking technology that Defendants intentionally installed on the Website.

279.    Plaintiff and the Maryland Subclass members were harmed and suffered ascertainable loss including, among other things, improper taking of their valuable data as a proximate and direct result of Defendants' unfair and deceptive trade practices.

280.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and the Maryland Subclass members suffered and will continue to suffer injury in fact and/or actual damages.

281.    Defendants' violations present a continuing risk to Plaintiff and the Maryland Subclass members as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

282.    Pursuant to Md.  Code Ann., Com.  Law §13-408, Plaintiff and the Maryland Subclass members seek monetary relief against Defendants in the amount

of actual damages, attorneys' fees, and any other just and proper relief available under the MCPA.

## COUNT VII
**Unjust Enrichment**
**(*On Behalf of Plaintiff & Class*)**
**(*Against All Defendants*)**

283.    Plaintiff realleges and incorporates the preceding allegations as if fully set forth herein.

284.    Unjust enrichment is established where (1) a party confers a benefit upon another; (2) the benefitting party knows or appreciates the benefits; and (3) the benefitting party's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow them to retain the benefit without the paying of value in return.

285.    Plaintiff and Class members conferred a benefit on Defendants in the form of valuable, private communications Defendants collected from Plaintiff and Class members.  Defendant collected, used, and disclosed this information to third parties, including Meta and TikTok for its own gain, including for advertising, analytics, and marketing purposes.

286.    Defendants knew or appreciated the benefits of such information that it intentionally collected and disclosed to third parties, including Meta and TikTok, by virtue of its unauthorized disclosure and use of this data and the valuable analytics, insights, and advertisements generated from it.

287.    Plaintiff and Class members would not have provided their valuable private communications to Defendants if they had known Defendants was disclosing it to third parties, including Meta and TikTok, and using it for its own gain.

288.    Defendants unjustly retained these benefits at the expense of Plaintiff and Class members.  Defendants did not provide any commensurate compensation to Plaintiff and Class members in exchange for its disclosure of their private communications for its own gain.

289.    The benefits that Defendants derived from Plaintiff's and Class members' private communications rightfully belong to Plaintiff and Class members. It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

290.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

### COUNT VIII
### Invasion of Privacy – Intrusion Upon Seclusion
### (*On Behalf of Plaintiff & Class*)
### (*Against All Defendants*)

291.    Plaintiff realleges and incorporates the preceding allegations as if set forth fully herein.

292.    intrusion upon seclusion occurs when (1) the defendant intentionally intrudes upon the plaintiff's solitude, seclusion, private affairs, or concerns; (2) in

which an individual has a reasonable expectation of privacy; and (3) in a manner that would be highly offensive to a reasonable person.

293.    Plaintiff and Class members have an objectively reasonable expectation of privacy, solitude, and seclusion in their private communications on the Website, including their Private Information.    Plaintiff and Class members reasonably expected that such information would remain private.

294.    Defendants intentionally intruded upon Plaintiff's and Class members' solitude, seclusion, and private affairs or concerns when they disclosed Plaintiff's and Class members' private communications, including Private Information, to third parties through the third party analytics and advertising tracking technology they incorporated on the Website.

295.    Plaintiff and Class members did not consent to or authorize, nor were they aware of Defendants disclosure of their private communications to third parties, including Meta and TikTok, through the third party advertising and analytics tracking technology that Defendants deployed on the Website.

296.    Defendants' intentional disclosure of Plaintiff's and Class members' private communications, including Private Information, to third parties is highly offensive to a reasonable person.    Reasonable people would expect their communications with a fertility provider to remain private and find the unauthorized disclosure of those communications to be highly offensive given the nature of the information conveyed.

297.   Plaintiff and Class members have suffered harm and injury as a direct and proximate result of Defendants' invasion of their privacy.  Further, by disclosing Plaintiff's and Class members private communications to third parties, including Meta and TikTok, Defendants took Plaintiff's and Class members' valuable information and derived benefit therefrom without Plaintiff's or Class members' knowledge or consent and without sharing the benefit of such value.

298.   Plaintiff and Class members seek appropriate relief for that injury, including, but not limited to injunctive and declaratory relief, general and actual damages, and punitive damages that will reasonably compensate Plaintiff and Class members for the harm to their privacy interests as well as a disgorgement of profits earned as a result of its intrusion upon Plaintiff's and Class members' solitude, seclusion, and private affairs or concerns.

299.   Plaintiff and Class members also seek such other relief as the Court may deem just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter an order:

    a)  Certifying the Class and Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representatives of the Class and Subclass and  Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

b) Finding in favor of Plaintiff and the Class members and against Defendants on all counts asserted herein;

c) Awarding declaratory relief against Defendants;

d) Awarding such injunctive and other equitable relief as the Court deems just and proper;

e) Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

f) Awarding Plaintiff and the Class members prejudgment interest and post-judgment interest on all amounts awarded; and

g) Awarding punitive damages, reasonable attorneys' fees, and costs to counsel for Plaintiff and the Class; and

h) Granting such other relief as the Court deems proper and just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38 and Civil Local Rule 3-6(a), Plaintiff hereby respectfully demands a jury trial on all issues triable by jury.

Respectfully submitted,

Dated: August 5, 2025

**HEDIN LLP**

By: */s/ Frank S. Hedin*
Frank S. Hedin

*Attorney for Plaintiff and the Putative Class*